276 P.3d 518

**Joseph ALOSI and Joyce Alosi, husband and wife, Plaintiffs/Appellants,**

v.

**William Wesley HEWITT, Defendant/Appellee.**

No. 1 CA–CV 11–0004.

Court of Appeals of Arizona, Division 1, Department B.

May 3, 2012.

Mariscal, Weeks, McIntyre & Friedlander, P.A. By Anne L. Tiffen, Todd A. Baxter, and Alex & Gaxiola, P.C., By Andrew R. Alex, Phoenix, Co-counsel for Plaintiffs/Appellants.

The Sorenson Law Firm, LLC By Johnny J. Sorenson, Nikki J. Johnson, Tempe, Attorneys for Defendant/Appellee.

## OPINION

SWANN, Judge.

¶ 1 While driving, Audrey Fuller accidentally collided with Joseph Alosi and injured him. Alosi sued Fuller, the company that employed her, and a related company that owned the car she was driving. Alosi eventually moved to amend his complaint to add the owner of both of those companies, William Hewitt, as a defendant. Because Hewitt and Fuller were involved with one another romantically, Alosi argued that Hewitt was properly a defendant in the action under the family purpose doctrine. Because Fuller was employed by Hewitt's company, Alosi also argued that Hewitt was liable under an agency theory. The court denied leave to assert liability under the family purpose doctrine, but allowed the addition of Hewitt on a theory of respondeat superior. Ultimately, the court granted summary judgment in favor of Hewitt.

¶ 2 Alosi appeals, and we affirm the trial court's ruling concerning the family purpose doctrine as well as the court's entry of summary judgment against him on the agency theory.

## FACTS AND PROCEDURAL HISTORY

¶ 3 The accident happened on the morning of November 29, 2007, while Fuller was driving a car owned by General Property Mortgage, one of Hewitt's companies. Fuller acknowledged in her deposition that she was running two errands in the car that morning: she was transporting a two-year-old boy to

school, and she was dropping off a letter for General Property Lending.

¶ 4 General Property Lending is another company owned by Hewitt. Fuller began working for that company in December 2005 after a mutual friend encouraged her to get reacquainted with Hewitt, whom she had known in high school. The letter Fuller was going to deliver that morning was addressed to Jay Fischer, the president of General Property Lending. Fuller testified that she was delivering the letter for Hewitt.

¶ 5 Fuller's plan was to drive the letter from Hewitt's house to a courier service that would deliver it to General Property Lending, which was based in Colorado. Fuller had spent the night at Hewitt's house because they were in a "romantic relationship," having become, in Fuller's words, "boyfriend and girlfriend." Consequently, Fuller often spent the night at Hewitt's house in Carefree, Arizona, or at his house in Denver, Colorado. Although Fuller described Hewitt's Colorado house as her "residence," she would often fly to Arizona and spend anywhere from a few days to a full month with Hewitt at his house in Arizona.

¶ 6 During his deposition, Hewitt testified that while the two lived together, Fuller would do "regular household things." She would go shopping, pick up groceries, and take care of personal bills. He said that she was a great cook and that she cleaned up after him. Additionally, Hewitt testified that Fuller picked up "our mail, her mail and my mail."

¶ 7 After dropping off the letter that morning, the second errand Fuller ran in the car was to drop a young boy off at school. On appeal, Hewitt characterizes the boy as his "young houseguest." At that time, the boy lived with his mother and would sometimes visit Hewitt. Hewitt was paying for the boy's tuition at a Montessori school. Hewitt had asked Fuller once or twice before to take the boy to school—it was something she did "very rarely"—and on the morning of November 29, Fuller was in charge of getting the boy to Montessori.

¶ 8 Fuller first drove to the delivery service that she had planned on using. When she arrived, she discovered that it had gone out of business. At that point, she decided to drive the boy to school. But once she got near the school, she missed the turnoff. When she turned the car to go back, she drove through a stop sign and collided with Alosi's motorcycle.

¶ 9 On November 10, 2008, Alosi filed a complaint against Fuller, General Property Lending, General Property Mortgage and other related business entities. The complaint alleged that Fuller collided with Alosi's motorcycle by driving negligently. It also alleged that General Property Lending and General Property Mortgage and the related entities were liable for Fuller's negligence because she was acting as their agent.

¶ 10 On September 8, 2009, Alosi filed a motion for leave to amend the complaint to add Hewitt as a defendant. Alosi argued that Hewitt should be joined as a defendant under the family purpose doctrine as well as under an "agency and respondeat superior" theory. On November 20, 2009, the trial court denied the motion to amend under the family purpose doctrine; it found that "[t]he individuals involved were not a 'family' under that doctrine on the undisputed facts." It granted the motion, however, with respect to "the agency claim" against Hewitt.

¶ 11 On May 28, 2010, Hewitt filed a motion for summary judgment on the agency claim. Hewitt's motion emphasized the fact that he and Fuller had a boyfriend-girlfriend relationship, and he argued that as a matter of law, a boyfriend is not vicariously liable for the driving of his girlfriend even if she were driving on a joint errand at the time of the accident. The court granted the motion on August 13, 2010, finding "that there [was] no genuine issue of material fact regarding the issue of whether Mr. Hewitt is vicariously liable for Ms. Fuller's driving." The court also noted that all other claims in the case had been settled. A final judgment in favor of Hewitt was entered on November 1, 2010.

¶ 12 Alosi timely appeals, raising two issues. The first is whether the trial court improperly denied his motion to amend the complaint to include a claim against Hewitt under the family purpose doctrine. The second is whether the court improperly granted Hewitt summary judgment on the agency

theory. We have jurisdiction under A.R.S. §§ 12–120.21 and –2101.

### STANDARDS OF REVIEW

¶ 13 When a motion to amend a pleading is denied, we review the denial for a clear abuse of discretion. *MacCollum v. Perkinson*, 185 Ariz. 179, 185, 913 P.2d 1097, 1103 (App.1996). Generally, denying a party leave to amend is an abuse of discretion when the party "merely seeks to add a new legal theory." *Id.* But a "trial court does not abuse its discretion by denying a motion to amend if it finds ... futility in the amendment." *Bishop v. State Dep't of Corr.*, 172 Ariz. 472, 474–75, 837 P.2d 1207, 1209–10 (App.1992). When reviewing the denial, we presume that the facts alleged in the complaint are true. *MacCollum*, 185 Ariz. at 185, 913 P.2d at 1103.

¶ 14 When a motion for summary judgment is granted, we review the judgment de novo. *Johnson v. Hispanic Broadcasters of Tucson, Inc.*, 196 Ariz. 597, 598, ¶ 2, 2 P.3d 687, 688 (App.2000). We view the evidence in the light most favorable to the party against whom summary judgment was entered, and we resolve all inferences from the evidence in that party's favor. *Prince v. City of Apache Junction*, 185 Ariz. 43, 45, 912 P.2d 47, 49 (App.1996).

### DISCUSSION

**I. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND THE COMPLAINT TO INCLUDE THE FAMILY PURPOSE DOCTRINE.**

¶ 15 Alosi relies on *Pesqueira v. Talbot*, 7 Ariz.App. 476, 480, 441 P.2d 73, 77 (1968), for the elements of the family purpose doctrine:

[T]here must be a family with sufficient unity so that there is a head of the family, the motor vehicle responsible for the injury must have been one 'furnished' by the head of the family to a member of the family and this vehicle must have been used on the occasion in question by the family member with the implied or express consent of the head of the family for a family purpose.

According to Alosi, the facts alleged establish those elements. He argues that the relationship between Hewitt and Fuller is such that it can be called a "family," and that Hewitt is clearly its "head." Alosi insists that because the doctrine does not depend upon the "technicality of marriage," the trial court abused its discretion by denying him leave to amend his complaint.

¶ 16 Alosi bolsters his argument with the broad definition of "family" set forth in *Brown v. Stogsdill:* "a group of individuals living under one roof and usually under one head: HOUSEHOLD." 140 Ariz. 485, 487, 682 P.2d 1152, 1154 (App.1984) (quoting *Webster's New Collegiate Dictionary* 410 (1980)). Alosi also points us to the following language in that case:

For the family purpose doctrine *the family is not limited to parents and their minor dependent children.* An adult who is not dependent and who is self-sustaining can still be considered a member of the household for the purposes of the family purpose doctrine so long as the family itself is a family unit with a family head.

*Id.* (emphasis added).

¶ 17 Analysis of the history and purpose of the family purpose doctrine leaves us unpersuaded that it has any application to these facts. We begin with the first Arizona case to introduce the doctrine, *Benton v. Regeser*, 20 Ariz. 273, 179 P. 966 (1919). In that case, Regeser was riding his bicycle and was injured when a minor, Bryan Benton, negligently drove a truck into him. The truck belonged to Bryan's father, R.L. Benton. *Id.* at 275, 179 P. at 966. The complaint alleged that Bryan was acting as R.L.'s agent and "was operating the car at the time of the accident in the business of his father." *Id.* at 274, 179 P. at 966. The issue in the case was cast as whether Bryan's father could be held liable for Bryan's negligence "under the doctrine of respondeat superior." *Id.* at 275, 179 P. at 967.

¶ 18 The court noted that R.L. Benton kept and maintained the truck "for the use of the members of his family, and for their pleasure and convenience." *Id.* Bryan had been using the truck that morning to drop his sisters off at one church and to pick up his brother from another. *Id.* Whether those facts were sufficient for "a parent ... to be

held liable for the negligence of his minor son" was a question that had "never been decided" in Arizona. *Id.* at 276, 179 P. at 967. The court found that they were sufficient under the new rule:

[A] father who furnishes an automobile for the pleasure and convenience of the members of his family makes the use of the machine for the above purposes his affair or business, and that any member of the family driving the machine with the father's consent, either express or implied, is the father's agent.

*Id.* at 278, 179 P. at 968.

¶ 19 This new rule, the *Benton* court explained, was "based on sound reason." *Id.* It quoted a Tennessee case for the underlying rationale:

If owners of automobiles are made to understand that they will be held liable for injury to person and property occasioned by their negligent operation by infants or others who are financially irresponsible, they will doubtless exercise a greater degree of care in selecting those who are permitted to go upon the public streets with such dangerous instrumentalities.

*Id.* (quoting *King v. Smythe*, 140 Tenn. 217, 204 S.W. 296 (1918)). Despite its sweeping language, however, *Benton* has never been applied to impose vicarious liability merely because a permissive user of a car is "financially irresponsible."

¶ 20 In *Young v. Beck*, 227 Ariz. 1, 251 P.3d 380 (2011), the most recent Arizona case concerning the doctrine, our supreme court reaffirmed the doctrine's vitality and recapped its rationale. There, the parents of the seventeen-year-old Beck provided him with a car that he could drive to school, church, and work. *Id.* at 3, ¶ 2, 251 P.3d at 382. After Beck was involved in an accident, his parents told him not to use the car to "taxi" his friends around or to drive their girlfriends home. *Id.* A month later, Beck used the car to drive himself and his friends around so that they could throw eggs at houses and cars parked on the street. *Id.* at ¶¶ 3–4. After the egging, Beck dropped off a friend's girlfriend and, on his way to drop off another friend, collided with Young, who was seriously injured. *Id.* at ¶ 4. Under the family purpose doctrine, Young won a judgment

against Beck's parents, and this court affirmed it. *Id.* at ¶¶ 5–6.

¶ 21 The Becks appealed to the Arizona Supreme Court, arguing that the family purpose doctrine had been abolished by the Uniform Contribution Among Tortfeasors Act ("UCATA"). *See id.* at 4, ¶ 12, 251 P.3d at 383. The court held that it had not been abolished, *id.* at 5–6, ¶ 19, 251 P.3d at 384–85, and that the rule articulated in *Benton* survived the UCATA. *Id.* at 5, ¶¶ 15–16, 251 P.3d at 384.

¶ 22 The Becks next argued that the doctrine should be abandoned. *Id.* at 6, ¶ 21, 251 P.3d at 385. The court acknowledged that other courts and scholars questioned the "original soundness of the family purpose doctrine's use of agency principles." *Id.* at 6, ¶ 23, 251 P.3d at 385. But even if some courts believed that the doctrine departed from "a classical theory of agency," Arizona still recognizes the legitimate "practical purpose" of the doctrine. *Id.* at 6, ¶ 19, 251 P.3d at 385(quoting *Jacobson v. Superior Court*, 154 Ariz. 430, 433, 743 P.2d 410, 413 (App. 1987)). The court explained that "[t]he doctrine's primary justification is to provide 'for an injured party's recovery from the financially responsible person—the family head— deemed most able to control to whom the car is made available.'" *Id.* at 6, ¶ 23, 251 P.3d at 385 (quoting *Jacobson*, 154 Ariz. at 431, 743 P.2d at 411). Because that justification was still sensible, the court held, the family purpose doctrine was still valid. *Id.* at 7, ¶ 24, 251 P.3d at 386.

¶ 23 The doctrine was nominally applied to impose liability on a husband for the negligence of his wife in *Mortensen v. Knight*, 81 Ariz. 325, 305 P.2d 463 (1956). That decision, however, was rooted almost entirely in a badly outdated notion of community property law that "this state recognizes the husband's dominance in the management and control of the common property." *Id.* at 334, 305 P.2d at 469. The divided supreme court in that case concluded:

[T]he family purpose doctrine applies to impose liability even though the automobile is community property, for the control and management is fixed by statute exclusively in the husband. Since it is the

husband's statutory obligation to manage and control the common personal property, the satisfaction of a judgment recovered against the appellee must necessarily be limited to the extent of his interest in the community at the time of its dissolution. Under the circumstances ... the whole of the community property is, of course, subject to the satisfaction of the judgment. *Id.* (citations omitted).

¶ 24 The view that the husband is the legal head of the family finds no support in modern law. To the extent *Mortensen* remains viable at all, we think it stands for the proposition that community property law contemplates as a general matter that the marital community is liable for the negligent driving by one spouse of a community automobile. Indeed, in *Selby v. Savard*, 134 Ariz. 222, 229, 655 P.2d 342, 349 (1982) (in division), the supreme court held that "[t]he Arizona rule is that the community is liable for the intentional torts of either spouse if the tortious act was committed with the intent to benefit the community, regardless of whether in fact the community receives any benefit."

¶ 25 After *Selby*, the elements of the family purpose doctrine set forth in *Young* are not necessary to impose vicarious liability among spouses—there need be no "head" of a marital relationship to warrant liability, and the use of the term "family purpose doctrine" in the spousal context is an anachronistic misnomer. Though the head or heads of a family may be readily identifiable as between parents and their children, the imposition of such a structure into the relationship between married or unmarried couples by the judicial identification of a "head" falls outside the proper role of the courts.

¶ 26 With the dubious exception of *Mortensen*, over the more than 90 years between *Benton* and *Young*, the family purpose doctrine in Arizona has not expanded beyond the parent-child relationship.[1] The *Young* court said explicitly that the doctrine's purpose is to help deal with "accidents caused by young, inexperienced, and financially insecure drivers" and that its "policy goals" are "providing compensation to such

accident victims and encouraging parents to ensure that their children operate motor vehicles safely and obediently." 227 Ariz. at 7, ¶ 24, 251 P.3d at 386. Neither the facts nor the rationale in *Benton* and *Young* require that the family purpose doctrine encompass the boyfriend-girlfriend relationship between Fuller and Hewitt.

¶ 27 We reach this conclusion not because of any rigid definition of "family," but because the rule proposed by Alosi would effectively transform the family purpose doctrine into a broad source of vicarious liability where none has ever been created by our Legislature or our supreme court. The *Young* decision reaffirmed the importance of vicarious liability when youth and inexperience predictably lead to harm. But here, Fuller was neither young nor inexperienced. The only fact that makes this case different from any other permissive use case is that Fuller and Hewitt have a "romantic" relationship. We fail to see how the subjective feelings that Fuller and Hewitt have for one another have any bearing on the liability that either might face to a third party—the "romantic" relationship created no additional risk to the public that requires legal reallocation.

¶ 28 The strongest Arizona cases that Alosi can cite involve children who had only recently reached the technical age of majority. In *Brown*, the court applied the doctrine when the eighteen-year-old son caused a one-car accident that killed him and severely injured his passenger. 140 Ariz. at 486, 682 P.2d at 1153. The son was living in the parents' guesthouse, paying $20 a week for room and board, and driving a car his father had sold him for substantially less than market value. *Id.* at 486–87, 682 P.2d at 1153–54. And in *Pesqueira*, the court applied the doctrine to a mother when her daughter caused an accident at the age of nineteen. 7 Ariz.App. at 477, 441 P.2d at 74. The daughter was driving a car her mother had bought for her when the daughter was eighteen. *Id.* The court held that the mother qualified as the "head of the family" because she provided

---

1. The concurrence expresses concern that our opinion could be read to restrict the doctrine categorically to parents and children living in the same household. We do not reach that question because it is not essential to our decision.

the daughter with room and board. *Id.* at 480, 441 P.2d at 77. In reaching its decision, the court noted "that the family purpose doctrine is to be given broad effect in Arizona." *Id.*

¶ 29 Alosi argues that these cases suggest that the doctrine's effect should be broad enough to include Hewitt as the "family head" who is responsible for Fuller's use of the car. But neither of those cases supports the notion that the doctrine can apply (or ever has been applied) to torts committed by independent adults. In fact, those cases only reinforce the notion that the rule is addressed to problems that arise when a parent furnishes a car to a potentially irresponsible and financially insecure young driver. In applying the rule, the *Brown* and *Pesqueira* courts did not stop the injured parties from suing the parents because the children had passed their eighteenth birthdays—they simply recognized that the risks posed by very young drivers (and the financial responsibility of those drivers) may not be meaningfully different at the instant the child reaches majority.

¶ 30 Even if Hewitt was furnishing Fuller with room and board as well as the car that she accidentally drove into Alosi, Hewitt is not the kind of party that the doctrine deliberately exposes to liability: the parent who puts a youth behind the wheel. The trial court, therefore, did not abuse its discretion when it denied Alosi leave to amend the complaint under the family purpose doctrine.

## II. THE COURT PROPERTY GRANTED HEWITT SUMMARY JUDGMENT ON ALOSI'S VICARIOUS LIABILITY THEORY.

¶ 31 On appeal, Alosi claims that there is "a genuine issue of material fact whether Fuller was Hewitt's agent when the accident occurred." He argues that summary judgment is precluded on "the agency theory." We disagree.

¶ 32 Although Alosi insists that Fuller was Hewitt's agent, the relevant issue is not really agency. The long-standing rule is that "a principal is not responsible for physical harm caused by the negligent conduct of an agent who is not a servant, even though the latter is engaged in the performance of the principal's business, unless the act which caused the harm was done in a manner directed or authorized by the principal." *Consol. Motors v. Ketcham,* 49 Ariz. 295, 305, 66 P.2d 246, 250 (1937). Here, nothing suggests, nor does Alosi allege, that Hewitt directed the "manner" of Fuller's driving.

¶ 33 There is another form of vicarious liability—respondeat superior—that could apply if the facts were to support a finding that Fuller was the special kind of agent mentioned in the language quoted above from *Ketcham:* a "servant."

¶ 34 The term "servant" denotes an agent who is employed by a principal "who controls or has the right to control the physical conduct of the other." Restatement (Second) of Agency § 2 (1958). That element of control that the employer exercises can give rise to his or her vicarious liability for an employee's conduct, e.g., driving a company car: "[A]n employer may be held vicariously liable on the theory of respondeat superior for negligent driving of a vehicle by its employee if the facts establish an employer-employee relationship and the negligence of the employee occurred during the scope of her employment." *Carnes v. Phoenix Newspapers, Inc.,* 227 Ariz. 32, 35, ¶ 9, 251 P.3d 411, 414 (App.2011).

¶ 35 In Hewitt's motion for summary judgment, he acknowledged that an issue of material fact existed as to whether Fuller was driving within the scope of her employment for *General Property Lending.* He denied, though, that any such issue existed with regard to Fuller as *his* employee. The trial court agreed with Hewitt, and we agree with the trial court's finding.

¶ 36 The undisputed facts show that Fuller was an employee of General Property Lending. Even though Hewitt was the owner of the company, her supervisor was the company's president, Jay Fischer—not Hewitt. Nothing in the facts alleged suggests that Hewitt exercised control over Fuller in the way that an employer controls an employee, or that he was her employer. We therefore find nothing in the record to create a factual dispute that could lead to the application of respondeat superior in this case.

## CONCLUSION

¶ 37 We affirm the trial court's order denying Alosi's motion to amend the complaint to include Hewitt as a defendant under the family purpose doctrine. We also affirm the trial court's order granting Hewitt summary judgment and dismissing him from this case.

CONCURRING: MARGARET H. DOWNIE, Presiding Judge.

KESSLER, Judge, specially concurring.

¶ 38 I concur with the majority on the issue of summary judgment. I also concur with the result the majority reaches on the denial of the motion to amend to assert the family purpose doctrine. However, I reach that same result through different reasoning. The majority opinion can be read as limiting the family purpose doctrine to relationships between parents and their children living in the same household. *Supra*, ¶¶ 23–29. I do not agree with that categorical limitation, but rely on the traditional fact-based elements of the family purpose doctrine—control and head of household—to find that the doctrine does not apply here.

¶ 39 The majority correctly points out that except for one Arizona case based on outdated community property principles, Arizona cases have not applied the family purpose doctrine to any case beyond a parent furnishing a family vehicle to a live-in child. *Supra*, ¶ 26. However, at least two Arizona cases have declined to categorically limit the doctrine to the parental-child relationship. *Jacobson v. Superior Court*, 154 Ariz. 430, 431, 743 P.2d 410, 411 (App.1987) ("The doctrine holds the owner, or person with control of the vehicle, or head of the family, liable for the negligent driving of a minor child or the *spouse* using the vehicle with the parent's or owner-spouse's permission, but for the driver's own pleasure or business.") (internal quotation marks omitted, emphasis added); *Pesqueira v. Talbot*, 7 Ariz.App. 476, 480, 441 P.2d 73, 77 (1968) (noting that the supreme court in *Mortensen v. Knight*, 81 Ariz. 325, 305 P.2d 463 (1956), relied on a Georgia case that held the doctrine could apply when a spouse furnishes the other spouse with the family vehicle and citing with approval a broad definition of household to include par-

ents, children, servants, and boarders if they are sharing a common dwelling and table).

¶ 40 Indeed, it appears that many jurisdictions do not limit the doctrine to parental relationships; rather, the doctrine applies when the persons are living in the same household and the person "furnishing" the vehicle has some control over the vehicle. *See*, e.g., R.E. Barber, *Annot., Modern Status of Family Purpose Doctrine With Respect to Motor Vehicles*, 8 A.L.R.3d 1191, §§ 8–9 (1966 & Cum.Supp.); *Robinson v. Lunsford*, 330 S.W.2d 423, 426 (Ky.1959) (stating doctrine would not apply to visiting son-in-law's use of car when parents-in-law had no moral or legal obligation to furnish support); *Hermosillo v. Leadingham*, 129 N.M. 721, 13 P.3d 79, 84–85 (App.2006) (holding doctrine did not apply to husband of estranged wife when they were not part of same household and husband had no control over vehicle); *French v. Barrett*, 84 Or.App. 52, 733 P.2d 89, 92 (1987) (jury question was presented whether doctrine could apply to daughter's fiancé who lived in household), *rejected on other grounds, Madrid v. Robinson*, 931 P.2d 791 (Or.1997); *Wiebe v. Seely*, 215 Or. 331, 335 P.2d 379, 387 (1959) (finding doctrine could apply to spouse).

¶ 41 In most cases involving adults living together as a couple, the doctrine would seemingly not apply because they are equal partners in using the family car. But that does not mean all couples are equal partners at all times. There may be cases in which limiting the doctrine to a parental figure allowing a live-in child to use the family vehicle would bar liability that would otherwise seem to call for application of the doctrine. As our supreme court has recently reiterated, the doctrine's "practical purpose [is] providing reparation for an injured party from the closest financially responsible party." *Young v. Beck*, 227 Ariz. 1, 6, ¶ 19, 251 P.3d 380, 385 (2011) (internal quotation marks and citation omitted). This purpose would be undermined if we limited the doctrine only to children living in the household, rather than others living in the household who rely on the "head of household" to furnish the car.

¶ 42 For example, if eighty-seven-year-old Uncle Joe was living with his son and his

son's family, the son and his wife let Joe use the family car, Joe had no history of unsafe driving but his reaction time was slower with age and he negligently drove the car, killing a third party, the son and his wife could never, under a categorical limitation, be liable under the family purpose doctrine simply because Joe was not their child.[2] Conversely, such a categorical limitation might unduly expand the doctrine simply based on familial relationships. Thus, if a thirty-year-old-son of a couple came back to live in the family household and was allowed to generally use the couple's car, but had his own car too, the couple would be liable for any accident the son caused, provided the other elements of the doctrine were met.

¶ 43 Limiting the doctrine to absolute categories is inappropriately rigid and does not serve the practical purpose of the doctrine. While in most cases that primary purpose will involve use of the family vehicle by a child and not by a spouse, there is no reason to limit application of the doctrine based on absolute categories. *Compare Young, id.* (referring to a wrongdoing minor) with *Jacobson,* 154 Ariz. at 431, 743 P.2d at 411 (stating that the doctrine can apply where the negligent driver is the spouse of the family head).

¶ 44 The appropriate breadth of the doctrine can be premised on its traditional elements. Under the doctrine "a head of household who furnishes or maintains a vehicle for the use, pleasure, and convenience of the family is liable for the negligence of family members who have the general authority to drive the vehicle while it is used for family purposes." *Young,* 227 Ariz. at 4, ¶ 8, 251 P.3d at 383 (quoting *Young v. Beck,* 224 Ariz. 408, 410, ¶ 8, 231 P.3d 940, 942 (App.2010)). Thus, the doctrine consists of three elements: "(1) when there is a head of the family, (2) who maintains or furnishes a vehicle for the general use, pleasure, and convenience of the family, and (3) a family member uses the vehicle with the family head's express or implied permission for a family purpose." *Id.,* 227 Ariz. at 8, ¶ 28, 251 P.3d at 387.

¶ 45 The key issue here is not whether Fuller was Hewitt's child, wife, or live-in girlfriend. Rather, the issue is whether Hewitt was the "head of household," that is, the "financially responsible person ... deemed most able to control to whom the car is made available." *Id.* at 6, ¶ 23, 251 P.3d at 385; *accord Jacobson,* 154 Ariz. at 431, 743 P.2d at 411 (holding the doctrine requires that a person to be held liable is the person with control of the vehicle or the "head of the family"); *Pesqueira,* 7 Ariz.App. at 480, 441 P.2d at 77 (identifying the head of the family as the one on whom other members are wholly or partly dependant for support).

¶ 46 Thus, the element of "head of household" is not always governed by a person's relationship to other members of the household (e.g., father, husband, or wife), but governed by the fact of control. That element of control is not present here.

¶ 47 The facts are relatively undisputed. Fuller lived in both Denver and Carefree in homes owned by Hewitt. On the day of the accident, she was in Carefree living at Hewitt's home and her car was parked in Denver. While Hewitt testified in deposition that he allowed anyone on the insurance policy to drive the car, Hewitt and Fuller both regularly drove the car, both of them had keys for the car and it was understood that she could use it for business and personal purposes. On the day in question, Fuller did not feel she needed to ask and Hewitt did not give permission to her to use the car. Rather, Hewitt merely asked her to run some personal and business errands and given her general access to the car, she did not feel any need to ask him for permission to use any of the cars.

¶ 48 This is not the kind of case in which Hewitt or anyone else was the head of household, i.e., "the financially responsible person ... deemed most able to *control* to whom the car [was] made available." *Young,* 227 Ariz. at 6, ¶ 23, 251 P.3d at 385 (emphasis added). Rather, it was simply two members of the same household with equal access and ability to regularly use the vehicles. Effectively, for

2. The majority correctly does not address liability under a negligent entrustment theory. The family purpose doctrine is premised on vicarious liability. *Young,* 227 Ariz. at 5–6, ¶ 19, 251 P.3d at 384–85. In contrast, negligent entrustment is based on direct liability of the person authorizing use of the vehicle to a person she knew or should have known was a risky driver. *Acuna v. Kroack,* 212 Ariz. 104, 109, ¶ 17, 128 P.3d 221, 226 (App.2006).

the family purpose doctrine, this scenario is indistinguishable from a married couple owning separate cars and regularly using either car to run errands. The two members of the family are co-equal partners in using the cars; neither control the car for purposes of the doctrine. The fact that the cars were owned by one member of the couple or his or her company is irrelevant to the doctrine. *See Young, id.* at 5, ¶ 15, 251 P.3d at 384 (noting that agency and not ownership is the test of liability); *Jacobson,* 154 Ariz. at 431, 743 P.2d at 411 (stating doctrine is based imperfectly on agency principles). *But cf. Jackson v. Reed,* 229 Ga.App. 433, 494 S.E.2d 52, 53–54 (G1997) (doctrine did not apply to 36–year–old stepdaughter who was house sitting and who lived elsewhere, whose own car was having maintenance problems, and who used the family truck to run an errand because she was not part of household).

¶ 49 Accordingly, based on the traditional test for the family purpose doctrine, I concur with the majority that the trial court did not err in denying the motion to amend the complaint.